Fuchsberg, J.
(dissenting). Claimant, Franklin Record Center, owner of a Manhattan loft building purchased for $340,000 and thereafter appropriated for a public purpose, elected to appeal from a Special Term award of $635,000, a sum fixed after comparison with the market value of other buildings of similar size, structure and location. On review, a sharply divided Appellate Division was persuaded to render a decision which, when applied on remand, enlarged the award to $1,100,000. This it accomplished by placing a compensable value on the owner’s exploitation of what, in the majority’s words, is describable either as a “unique entrepreneurial device” or a “unique idea” (69 AD2d, at p 112) for the management of the premises. Because, in my view, the additional allowance runs counter to the principles of the law of eminent domain, I am compelled to dissent.
One of several interrelated corporations owned by the same principals, the claimant is engaged in the moving and storage business. The condemned building, one of seven under the control of itself and its associates, was devoted to customers who required space for the storage of office furniture, business records and the like. The “unique idea” it employed at this building was the use of portable metal partitions which, since these were not affixed to the realty, could be moved about to provide customers with space limited to their actual requirements. So, what in other respects was a “standard form of loft lease” would provide, for instance, for the rental of “a room of sufficient size to accommodate 55 transfiles or its equivalent”. In *63 addition, to further extend the effective use of space longitudinally as well as horizontally, it would also undertake to install shelving for occupants at its own cost. Since tenants thus could avoid committing themselves for a larger area than they needed at a particular time, compensatorily they could be prevailed upon to agree to a per square foot charge in excess of the prevailing rate for similar space in neighboring warehouses whose managers did not so precisely tailor space to use. The bargaining position this modus operandi achieved also made it possible for the claimant to exact commitments for the exclusive right to the business of moving the belongings of an occupant in and out of the space. Furthermore, as the dissenters at the Appellate Division pointed out, the mobility of the “entrepreneurial device” which brought all this about was such that, when the building was condemned, the claimant “quickly acquired an alternative property” (69 AD2d, at p 115) for its continued advantagement.
It was for a warehouse property whose business was so conducted that claimant pressed for an enlargement of the $635,000 awarded in the tentative decree, a quest on which it bore the burden of proof (Heyert v Orange & Rockland Utilities, 17 NY2d 352, 364; 5 Nichols, Eminent Domain, § 18.5; cf. Matter of Rochester Urban Renewal Agency v Willsea Works, 48 NY2d 694). Yet, it relied solely on an unadjusted capitalization of income approach. And, the single expert through whom it advanced this theory chose to draw no distinction between income fairly attributable to the property as such and that which could be said to be the avails of his client’s entrepreneurial ingenuity. Offering no evidence as to sales or rentals involving comparables, and indeed admitting on cross-examination that physically comparable warehouses would bring much less than his $1,100,000 appraisal, to justify the disparity he fell back upon the fact that his client’s building was “operated in a vastly different manner than a normal loft building”. So doing, he in no way attempted to rely on any special physical characteristics of the property per se nor to offer proof of sums expended by it and its affiliates in support of its idiosyncratic business “idea”.
*64 In contrast, the city’s appraiser utilized a combined market and capitalization method, in the process citing specific sales and rentals of premises whose structural and geographical comparability went unquestioned. Amplifying his rationale, he expressed the opinion that the revenue claimant received from those who stored property on the condemned premises was greater than that of each of the comparables only because the others reflected real estate income alone, while that of the claimant represented “a marriage or a combination” of that attributable to the real estate and that attributable to its extraordinary business acumen. The value of the latter, he pointed out, would not be realized in a sale of the property on the open market.
On this record, Special Term, finding as a fact that the revenue received from the storage customers was “entwined with the skill, fortune, judgment and good management of the business conducted on the premises in conjunction with other interrelated property”, rejected the claimant’s appraisal as a “mathematical exercise of no probative value”. But, for its part, reversing on the law and the facts, the Appellate Division majority held it error to base an award on a “hypothetical rent roll” which, in its view, deprived the claimant of the benefit of its “unique idea” (69 AD2d, at p 112).
Before venturing my own analysis, it seems in order to observe, as has long been recognized, that the “just compensation” to which one whose property is taken under the power of eminent domain is entitled (US Const, 5th Amdt; NY Const, art I, § 7), does not embrace every conceivable loss or inconvenience. Thus, assuming that, as here, it is the realty and not the business which is condemned, the incidental damages to good will wrought by removal of a business conducted on premises taken for a public purpose is to be seen as one of the burdens, if that it be, that is balanced by the benefits of government (Banner Milling Co. v State of New York, 240 NY 533, cert den 269 US 582; see Kimball Laundry Co. v United States, 338 US 1, 5).
This in mind, especially since the claimant’s building, undisputably, is not a specialty (see Dormitory Auth. of State of N. Y. v 59th St. & 10th Ave. Realty Corp., 51 AD2d 953, affd 41 NY2d 1037), the preferred method of comput *65 ing appropriate compensation was not keyed to its worth to the owner, but to market value, no more and no less (Matter of Rochester Urban Renewal Agency [Patchen Post], 45 NY2d 1, 8; United States v Certain Prop., 306 F2d 439, 447).
Regarded as accepted criteria for ascertaining market value are comparable sales (Matter of Great Atlantic & Pacific Tea Co. v Kiernan, 42 NY2d 236, 239). However, in the case before us now, to meet the need to segregate the component of the income inherent in the realty itself from that which could be fairly adjudged to have been managerially produced, the city’s appraiser took a two-step approach. First, by studying the comparables, uncomplicated as these were by any “unique entrepreneurial device”, he was able to ascertain their “overall price per square foot of building”. Then, applying the “gross rent multiplier” so disclosed to the square footage in claimant’s building, he arrived at the price a willing purchaser, in light of the picture presented by the comparables, would pay a willing seller in the open market.
In following this procedure, the appraiser acted in accordance with the sound principle that the contractual rents reserved do not necessarily control the evaluation of real estate. For, the ultimate determinant is “economic rent”, a term of art which may be defined as the maximum net rent a property can produce in the long run (Ring, Valuation of Real Estate [1963 3d ed], pp 194-195). This flows from the fact that, because “contract rent may be greater or lesser than the economic rent under the highest and best — and legally permissible — use of the property”, calculation of economic rent demands that the appraiser make “appropriate adjustments” to reflect “economic advantages or disadvantages” ascribable to inchoate factors such as the vicissitudes of a commercial undertaking (ibid.). In sum, the contractual rent, far from being conclusive, is but one of the relevant facts and circumstances to be considered (Matter of City of New York [Lincoln Sq. Slum Clearance Project), 16 NY2d 497, 499; Kommit v State of New York, 60 AD2d 945, 946; Matter of Town of Oyster Bay, 50 Misc 2d 91, 94 [Hogan, J.]; 5 Nichols, Eminent Domain, § 19.21).
*66 Decisional law is well-nigh unanimous, therefore, in differentiating between earnings derived from the intrinsic use of property, which is compensable, and profits earned from a business being conducted thereon, which is not (Banner Milling Co. v State of New York, 240 NY 533, 539-541, supra; Matter of People v Johnson & Co., 219 App Div 285, affd 245 NY 627, cert den 275 US 571; see, e.g., Aloi & Goldberg, A Reexamination of Value, Good Will and Business Losses in Eminent Domain, 53 Cornell LQ 604, 628). To the same effect, speaking pragmatically as well as conceptually, all the standard appraisal texts which have come to my attention stress the value of comparable rental data to separate the two (see Friedman, Encyclopedia of Real Estate Appraising [3d ed], p 496; McMichael, Appraising Manual [4th ed], p 305; American Inst of Real Estate, Appraisal of Real Estate [5th ed], p 359; see, also, Matter of City of New York [School of Ind. Arts], 2 Misc 2d 403, 408).
Returning now to the incontrovertible facts in the present case, it is almost impossible to say that claimant’s records storage business, even in the unusual way in which it was carried on, was inextricably related to or connected with the land or building at which it was located. By their very nature, the managerial talent and imagination the claimant applied to the conduct of the business could be, and indeed were, transferred to another site, which, though it would be acquired at a price which did not include the entrepreneurial overlay for which claimant here seeks additional compensation, presumably would soon be embellished by the same imaginative and promotional ability to service its customers in a fashion that disposed of less space for more dollars, an enterprise with which the city hardly would compete, much less pre-empt, simply because it took the underlying property for public use.
In short, it cannot be said that it was the character of the property, which on its own was indistinguishable from that of the much lower priced comparables, rather than the labors of its owner, which marked the difference between the $635,000 awarded by Special Term and the $1,100,000 to which the Appellate Division, by its vote of 3 to 2, would *67 have raised it. Consequently, in claimant’s expert’s own words, simply because the warehouse was “being operated in a vastly different manner than a normal loft building” does not add to its market value (e.g., United States v Certain Prop., supra; 1 Orgel, Valuation Under Eminent Domain, § 38, p 177).
To this I respectfully add that references to “highest and best use” in the opinions of both the majority here and that of the majority at the Appellate Division are simply inapropos. The phrase “highest and best use” conveys two ideas, neither of which serves the claimant’s cause. One, not asserted here, is that an owner of condemned property not be limited to its value for the use to which it is presently put when prospective rezoning or other changes in the character of its neighborhood would enhance its market price.[1] The second, urged here, is that property be evaluated in excess of market price when it is worth more to the owner. But the cases reveal that such a personal value receives recognition only when the subject property is a specialty (United States v Certain Prop., supra, at p 447),[2] while the sort of property readily bought and sold is governed by market value even in the face of a “clear discrepancy between market value and value to the owner” (1 Orgel, Evaluation Under Eminent Domain [2d ed], § 38, p 177).
Accordingly, instructed by the legal principles enunciated above, and on the facts in this record, I inescapably conclude that the findings at Special Term more nearly comported with the weight of the evidence. It follows that the order of the Appellate Division should be reversed and the decree at Special Term reinstated.
Chief Judge Cooke and Judges Jasen and Jones concur with Judge Meyer; Judge Fuchsberg dissents and votes to reverse in a separate opinion in which Judges Wachtler and Simons concur.
*68 Decree appealed from and order of the Appellate Division brought up for review affirmed, with costs.

. (E.g., Matter of Town of Islip [Mascioli], 49 NY2d 354 [probability of rezoning considered in evaluating highest and best use]; Matter of County of Suffolk [Firester], 37 NY2d 649 [growing residential demand considered in evaluating vacant land].)

. (E.g., Matter of County of Suffolk [Van Bourgondien], 47 NY2d 507 [greenhouse complex]; Keator v State of New York, 23 NY2d 337 [clubhouse]; Matter of Rochester Urban Renewal Agency [Patchen Post], 45 NY2d 1 [fraternal meeting hall].)