Howard T. Hogan, J.
The petitioner in this proceeding urges that a purported settlement agreement is a bar to a decision on the merits. This court does not sustain this position.
The alleged stipulation of settlement was never offered into evidence. The court did receive into evidence a claim voucher which presented a claim to the town highway account a notarized request for $3,300 as 1 ‘ Payment in settlement of all claims arising out of the condemnation ’ ’.
This claim voucher and the stipulation were forwarded to the Town Attorney with a letter dated June 2,1961, stating that such forwarding was without prejudice to the claimant’s right to 11 claim full damages should the amount agreed upon for the settlement of their claim not receive approval by the Town Board.”
The board, by resolution adopted on June 27,1961, authorized the Town Attorney to execute the stipulation in the amount aforesaid.
Thereafter and by letters dated July 5, 1961, August 2, 1961 and August 19, 1961, the claimant’s then attorney demanded either payment or the return of the stipulation. The latter two letters set forth a time limt for which the offer to settle would remain open. On August 21, 1961, he advised the town that: “ In reply to your letter of August 17th, I hereby advise you that my client’s offer of settlement of the above matter is hereby extended until September 1st, 1961 ”.
The August 17 letter is not in evidence, and the town has admitted that there was no written response to the other aforesaid letters. The Deputy Town Attorney in charge of this matter testified that upon receiving the letters he telephoned the claimant’s then attorney and advised him that the claim could not be paid until a consent was obtained from the tenant who had possession of the premises under a recorded lease, and who might have an interest in the award thereunder. He further testified that the claimant’s then attorney advised btm that the tenant had no such interest in the award and that the attorney refused to furnish the town with a copy of the lease. This refusal is of no import since a copy of the recorded lease could have been obtained by the town with little inconvenience.
At pages 116 and 117, the Deputy Town Attorney testified that: “ The necessary papers to consummate settlement were sent to the attorney for the owners and it was made part of the transaction that releases or consents would be obtained from *93 the Texas Oil Company which had a recorded lease of record. This was approximately in the summer of 1961.”
There is no proof as to which party was to obtain the release consent other than his further testimony that: “ the settlement was negotiated, subject to the subsequent release of the Texas Oil Company. I so informed Mr. Baker [claimant’s then attorney] by letter of my sending to Texas the necessary consent and release form ”.
Since the town had the forms it considered “ necessary ” and since the town in fact attempted to obtain the consent, it may fairly be inferred that the town felt it was responsible, or that it chose to become responsible for obtaining it.
According to the record, the first written request to the company for its consent was by letter from the Town Attorney dated September 27, 1961, over three months from the submission to the town of the stipulation and voucher, and well after the four letters sent by claimant’s then attorney. No excuse has been offered for such a lengthy delay. In any event, that company has never given its consent to the payment of the award to claimant.
The town now seeks to enforce the stipulation, but its own testimony shows that the agreement to pay the claimant was conditioned upon the actual execution of a consent by a third party. The agreement cannot be enforced because that third party has not consented and there is nothing to indicate the consent was waived or excused (see Van Iderstine Co. v. Barnet Leather Co., 242 N. Y. 425, 432). Under the circumstances, the town would never be justified in making an outright payment in full. It had actual notice that the tenant had an interest in the real property, that it claimed an interest in the award and that it refused to execute a consent when it was so requested. Nothing in the record indicates that during the past four years the town has stated, written, or accomplished anything which would indicate that it felt the stipulation to be binding, and the claimant has proceeded to retain expert witnesses and to bring this matter to a trial. Nothing on the part of either party indicates an intent to be bound by the previous agreement.
Section 15-501 (subd. 3) of the General Obligations Law provides as follows: “If an executory accord is not performed according to its terms by one party, the other party shall be entitled either to assert his rights under the claim, cause of action, contract, obligation, lease, mortgage or other security interest which is the subject of the accord, or to assert his right under the accdfd.”
*94 Here, by petitioner’s own admission, the parties contemplated the consent of the tenant to the amount and payment of the award to plaintiff. The agreement cannot be enforced because that condition has never been met.
The claimant was entitled to elect to seek an award in the within proceeding (see Pfleiderer v. De Veaux, 3 Misc 2d 252).
The area taken from the subject premises was 780 square feet. The property is zoned for Business “ F ” and its continued nonconforming use as a gasoline filling station has been found to be its highest and best use by both appraisers.
The entire subject property contained approximately 10,945 square feet prior to the taking of a strip of land 7.8 feet by 107.30 feet along one of the two streets upon which the station fronted.
At the time of the taking in June, 1960 and for approximately 11 years prior to May 28, 1961, the premises was leased to the Texas Company for $240 per month with the lessor paying the taxes. On March 2, 1961, after the taking, the station was the subject of a net lease to Sun Oil Company for 15 years at $6,000 per annum with a five-year option at $6,600 per year. Under this existing lease, the net monthly rent is $500 per month, over twice the rent prior to the taking.
The claimant’s appraiser utilized a capitalization approach to determine the before and after values of this property as a whole. He disregarded the actual rent received before the taking and instead utilized a ‘ ‘ net economic rent ’ ’ based upon that which “ the market would pay as contrasted with the contract rent or the rent reserved in a lease, which was the actual rent paid.”
The appraiser for the Town of Oyster Bay utilized a cost approach to valuation. He valued the land at $2.20 per square foot, or $1,716, found $1,500 as the cost of relocating the pump island and sign, and $130 for 87 square yards of asphalt at $1.50. He concluded that there was no severance damage due his finding that through the relocation of the pump island and sign, the efficiency of the station was unimpaired and the remainder of the station has the same value as part of the whole.
In the instant case, the station actually rented for far more after the taking than before. While the terms of a lease on condemned property, including the rent reserved, are admissible, they are not conclusive as to value (see Matter of Parking Field at West Hempstead, 232 N. Y. S. 2d 100; Matter of James Madison Houses, 17 A D 2d 317). Just as a claimant should not obtain an advantage due to a lease that is improvident for the *95 tenant, the claimant should not be at a disadvantage where the lease is improvident as to himself.
Similarly, the diminution of rental value is an excellent guide to the measure of damages in a proper case and even in a partial taking (see Humble Oil & Refining Co. v. State of New York, 15 A D 2d 686, affd. 12 N Y 2d 861).
The court cannot, however, apply evidence of capitalization of income in this case. In the first place, the actual rental figures do not show any damage whatsoever as a result of the taking. Secondly, there is insufficient evidence to establish a loss based on a loss of economic rent. It was asserted that the present tenant felt that the property had been damaged by $100 per month as a result of the taking. In the absence of testimony by the tenant itself, however, the record merely shows that the claimant had attempted to obtain $600 per month after the taking and that this was refused by the officers of the tenant, who then offered $500.
Moreover, the present tenant required renovations to the building itself, which was not the subject of physical taking. Claimant’s Exhibit “F” shows that the claimant contributed $1,500 towards these expenses, the over-all amount of which is not in the record.
With respect to the capitalization rate, claimant’s appraiser chose 9%; claimant’s experts in the field of gasoline filling stations both testified to a capitalization rate of 7 to 7%% as applying, and the petitioner’s expert agreed with this. Applying the 7 or 7%% rates, the result is unrealistically high, according to claimant’s appraiser.
Claimant’s appraiser did not use a built-up capitalization rate, but he chose 9% as reflecting increments for this specific property due to an additional risk factor concerning the probability of obtaining a lease and considering the fact that this property is in a nonconforming use under the Zoning Ordinance of the Town. The court does not feel that the arbitrary addition of 1%% to 2% is sound, and since there is no evidence as to the other components of the capitalization rate, the court cannot arbitrarily choose a rate.
We must value this property as of the date of vesting. At that point, the existing lease had only 11 months to run and was 11 years old. Nine months after the vesting, a new lease was executed as a result of negotiations and some improvement of the facilities by the claimant.
There are too many variables involved to apply a capitalization theory. Not only is the rate applied questionable, but, also, the *96 fair rental at the date of vesting, the influence and total amount of any improvements made, and the favorable impact upon the .site as a result of the increased traffic on the road.
Of far greater significance are the comparable sales submitted '¡by the petitioner which include sales of gasoline filling station :sites along the widened road and in close proximity to the subject property. It should be observed that sale number 8 is a resale of sale number 7; the square-foot price almost doubled within two years, which petitioner’s appraiser attributes to the road widening itself.
After considering all of the testimony, the exhibits and the comparable sales, this court finds the square-foot value of this parcel to have been $2.40 at the date of vesting, or $1,872 for the strip taken. The asphalt paving which was taken had a fair value of $130 and the cost of relocating the pump islands, signs and the like, was $1,845.70. The claimant’s direct damage is, therefore, $3,847.
Petitioner’s appraiser allowed no consequential damage, and claimant’s appraiser utilized solely the capitalization of income approach.
The court finds that there are consequential damages and that they are fixed in the sum of $4,000. The record is clear that the loss of the area taken restricts the number of cars that can be serviced or supplied with gasoline and that the signs and pumps are not as readily visible to attract motorists. Similarly, the room for customers to maneuver their vehicles has been reduced, which would tend to reduce the desirability of this site for its highest and best use.
The claimant is therefore entitled to an award of $7,847.70.
The following parcels in this proceeding were also viewed by the court and after considering the evidence and the exhibits, the below awards are made:

Damage Parcel Reputed Owner Award

10 Unknown.........................$ 300
25 Joseph and Walter Paul............ 3,200 AA
27 John M. Amato and
Vincent R. Passavia............ 7,500 A A
28 Unknown......................... 1,175
39 Unknown......................... 650
47 Unknown......................... 150
54 Unknown......................... 150
66 Unknown 1?075