Caroline K. Simon, J.
This is a claim for the appropriation of land owned by claimant’s assignors, Francis and Margaret Agrest, pursuant to section 30 of the Highway Law, for the reconstruction of S. H. 657, Croton-Eivcr-Peekskill, in the Town of' Cortlandt, Westchester County, described as Map. No. 201, Parcel No. 288.
The aforesaid map and description were stipulated by the parties as having been filed in the office of the Secretary of State on November 10, 1961, and in the office of the Westchester County Clerk on March 20, 1962, at which time title vested in the State. It also was stipulated that claimant was personally served on April 10, 1964.
The claim was filed with the Clerk of the Court of Claims and with the office of the Attorney-General on March 13, 1964. Francis and Margaret Agrest, by means of a written assignment dated February 21,1964, transferred to Guenther L. Kuehl all of their interest in the claim against the State of New York. The court recognizes this assignment to Mr. Kuehl and finds that the claim has not otherwise been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the description of the appropriated property as shown on a copy of the map and description attached to the claim, and the same is incorporated herein by reference.
*754 Claimant submits proof of ownership by means of the following documents:
An executor’s deed dated October 5, 1961 from Roxanne van de Beek, Administratrix cum testamento avmexo of the goods of David Fox, grantor, to Francis A. and Margaret Agrest, grantees, recorded in the Westchester County Clerk’s office on October 11, 1961 in Liber 6150 at page 104.
A contract of sale agreement dated January 18, 1963 between Francis and Margaret Agrest, sellers, and Guenther L. Kuehl, buyer, which includes the sale of “ any award for the taking or purchase for public purposes of any portion of the premises described above.”
A bargain and sale deed dated May 9, 1963 between Francis and Margaret Agrest, grantors, and Guenther L. Kuehl, grantee, recorded in the Westchester County Clerk’s office on May 13, 1963, in Liber 6299 at page 10.
At the commencement of the trial, claimant moved to amend his claim by increasing the damages from $12,000 to $50,000, due to information as to further damage stated to have been received by claimant subsequent to the filing of the claim. There was no objection by the State. The motion to amend was granted.
Before the appropriation, the property consisted of about 11 acres of irregularly shaped land elevated on a hill in the Town of Corlandt, with a frontage of approximately 270 feet on Reynolds Lane and improved by a two-story single-family 10-room dwelling and 3 one-story single-room cabins or cottages, and a shed, all in poor condition. The two-story dwelling was occupied without lease by a tenant who paid $50 a month. The other apartments and the 3 one-story cottages were vacant. The property was located in an R-20 Zone which permitted one-family residential construction with a minimum plot area of 20.000 square feet and a minimum frontage of 85 feet.
Mr. Kuehl testified that he had been a manufacturer of metal parts since 1951, having operated, in The Bronx, a plant of about 50.000 square feet, employing 180 workers, and with parking space for 120 cars. He stated that his purchase of the Agrest property was conditional upon obtaining a zoning variance so as to permit him to build a factory thereon. He added that this purpose had been encouraged by the local town officials, upon whose solicitation he planned to move his plant from The Bronx to Cortlandt, and that, in fact, the Town Board of Cortlandt, in its Resolution No. 78-63 dated March 13, 1963, amended its Zoning Plan Ordinance to change the R-20 Classification of the 11-acre parcel to an M-l Classification.
*755 The court finds this situation differs from those takings where only an intent to ask for zoning changes is shown. In the instant matter the town, whose Zoning Board would consider the application for zoning change, requested claimant to move his plant and gave some considerable degree of assurance that the zoning change would be made.
The property, taken in fee without access, consisted of .765± acre with 95 feet frontage on Reynolds Lane, and was approximately 40 feet wide and 830 feet long, including a dirt road and 1,500 feet of two-inch galvanized iron water line which, if newly installed, would have cost $3,000. On one side the adjoining property was, at the time of the taking, used as a bungalow colony, many of the bungalows being built on stilts. This was a nonconforming use of the land because of the close proximity of the small cabins to each other.
Mr. Kuehl stated that the construction of his factory building had commenced before the building of the new road started, and that the highway construction required the rerouting and cutoff of Reynolds Lane and the interruption of his water supply. He testified that his water lines were severed and his wells drained into the new excavation. A temporary substitute access road was built, which road later became permanent. He was left with little or no water until February of 1966 when a new water line was installed by him. The plant has only moderate need for water for sanitation, cleaning and limited use in connection with the machinery. The claimant testified that the supply available from the two wells and the two-inch line when he bought the land would have been adequate even for an expanded plant. The plant now has a sprinkler system which the buildings there at the taking date did not have.
Mr. Kuehl stated that he had spent $6,000 to widen and resurface the Reynolds Lane access road, $7,500 to drill new wells, and $1,800 for plastic 11/2-inch piping to his building. He then petitioned the Peekskill Mayor and Water Board, and was temporarily permitted to connect his lines to the nearest fire hydrant in order to keep his plant operating and his 85 workers employed. Some of his employees had complained to the New York State Department of Labor about the lack of sanitary facilities on the job, and other employees left their jobs because of the lack of available water.
The cost of drilling the 490-foot well which subsequently went dry was $4,000. Another $3,500 was spent drilling a 260-foot well which produced three gallons per minute. About $1,800 was spent on a plastic water line to the building when claimant found he could not obtain an adequate water supply *756 from the wells and only thereafter did he petition the Peeksltill Mayor and Water Board for help to avoid closing down the factory. It Avas then he Avas permitted to hookup to the nearest fire hydrant as a temporary measure.
The temporary hookup Avith the fire hydrant Avas found to be unsatisfactory due to the pipes freezing up in cold weather. Mr. ICuehl petitioned a second time and Avas thereafter permitted to run a 10-inch line into his plant. He testified that the cost of the temporary measure Avas $900 and the cost of the neAV main to be $25,000 of which $21,000 has already been spent.
Mr. ICuehl testified that the Ioav fire insurance rate he first enjoyed prior to the road construction increased sharply when the water supply was cut off, and that his insurance premium became $18,000 annually for an aggregate valuation of $900,000 for plant and equipment. This premium has since been loAvercd to $2,000 after the new water supply system began operating.
Claimant stated that the neAV narrower access road made it extremely difficult for trucks to turn Avithout backing up, and that they damaged the curbs, the trees and the hydrant when negotiating the five steep curves in the road during snoAvy or icy Aveather.
Claimant’s appraiser testified that the highest and best use of the property Avas for light industry, although zoned residential at the time of the taking. The State’s appraiser deemed its highest and best use to be residential both before and after the taking.
Claimant’s appraiser placed a before value of $10,000 per acre on the land, and regarded the house and cottages as of no value. He placed an after value of $5,000 an acre on the property. No written report was submitted by him.
The larger old building burned down assertedly because there Avas no Avater to put out the fire. The smaller buildings, though standing, are used by squatters who pay no rent.
Claimant asserted consequential damage resulted from the taking. At the time of building the plant, claimant had 300 feet distance on the Avest from Route 9 which was usable for expansion. Last Fall he added 10,000 square feet to the 32,000 square-foot plant originally built. The taking left only 120 feet on the west boundary which claimant says is not useful for the further expansion he had planned.
Mr. ICuehl testified that, although 20% of the parcel had thus far been developed by him for factory use, he had plans to continue to develop the remaining 80% by expansion of the factory. He stated that he regarded the remainder of the land *757 to have been consequentially damaged by the taking of three qxiarters of an acre.
Claimant was aware when he bought the property that the’ taking map had been filed and that title was in the State for the part taken. Therefore, the court does not find consequential damage to him from the narrowing of the land on the west and the change in plant expansion possibilities on that side since he had such knowledge of the taking and could be expected to develop his plant in relation to the situation existing.
The State’s appraiser regarded the taking as not having any detrimental effect on the remaining land especially because the new road is below claimant’s land. He limited the damage to the value of the appropriated portion. State’s appraiser used the comparable approach and stated he also used ‘ ‘ the cost and market data approach ” but not the income approach “ due to the lack of sufficient rentals in the area.” He found that in the instant matter the market approach was the soundest basis. The State’s comparables were zoned residential and required much adjustment because of topography and situation to be of any guidance to the court.
The State’s comparables included five sales of residential improved acreage in the area, at prices ranging from $510 per acre to $3,000 per acre. He also considered three parcels of land improved with dwellings in what he felt were more desirable areas than the location of claimant’s land. He estimated claimant’s before value to be $17,500, assigning $2,000 of this sum to the value of claimant’s water line. He valued the remainder of 10.235 acres at $14,700, assigning $4,000 of this to the building. He stated claimant’s damage to be $2,800, all direct, of which he assigned $800 to the land and $2,000 for the depreciated value of the water line.
Though claimant had lmoxvledge that the State planned to build the road, he and his witnesses testified to their knowledge and the general impression in the area being that the road would be closer to the railroad tracks than as it actually was built.
The State’s engineer testified to the issuance by the Department of Public Works in February, 1960 of preliminary maps showing the design work before the letting of construction contracts. He also stated that he was present at a public hearing held in Croton-on-Hudson on the evening of June 24,1957. This hearing had been announced previously in the local newspaper and townspeople attended, including some residents on Reynolds Lane. The engineer added that the same maps were exhibited *758 at the public hearing, and the transcript minutes of the hearing indicate that the State’s engineers admitted that Reynolds Lane would be cut off by the improvement but added that alternate access would be provided from a connecting service road. The maps showed a proposed viaduct for Kraft Lane, which viaduct was later eliminated from the plans and never built.
It is clearly the law in this State that damages may not .be recovered for interference with access or diversion of traffic by the State in changing the course of a highway. Damages, as a result of circuity of access are regarded as damnum absque injuria. (See Selig v. State of New York, 10 N Y 2d 34 [1961] and cases cited therein.)
The court recognizes that suitability of access is a question of fact and mere inconvenience does not stamp such access as unsuitable. (See Nash v. State of New York, 21 A D 2d 736 [1964].)
In the instant matter, Reynolds Lane was cut off at a point east of the new Route 9 near the northwest corner of the subject property, and a new road was built connecting the westerly end of Reynolds Lane to local streets in Peelcskill. Claimant, therefore, does have access, albeit perhaps less desirable access than had existed before the taking. Claimant considers the possibility is ever present that the City of Peelcskill, at some future time, may decide to bar claimant’s trucks from the city streets, should the size of his trucks and the narrow character of the local streets running through residential areas create traffic problems. This possibility cannot now be compensated since claimant’s trucking is presently permitted to use the streets.
The court accepts claimant’s position that the property, even at the time of taking, must have an influence added to its value from the extreme likelihood that it would be rezoned from Residential R-20 to an M-l Classification.
‘ ‘ The court must value property taken as of date of vesting. ’ ’ (See Matter of Town of Oyster Bay [Massapequa] 50 Misc 2d 91 [1966].)
Claimant is entitled to reimbursement for what existed at the time of the taking and was damaged by the appropriation. The water pipe was then a 2-inch pipe. Claimant seeks to include in his damages the cost of installation and material for the 10-inch pipe on the theory that the City of Peekskill required that the pipe be that size as a condition for permitting claimant to connect with that city’s water supply.
Claimant asserts that it was the-State’s destruction of the previous water system that placed qlaimant in the position which *759 required meeting the Peeksldll standards and specifications, since there was no alternative water source of supply available. The court recognizes the difficult circumstances in which claimant was placed. Nevertheless, it must be noted that certain positive advantages accrued from installing the 10-inch pipe, notably a large reduction in the cost of claimant’s fire insurance. The court finds that claimant is entitled to reimbursement for the 2-inch pipe, but not for the cost of 10-inch pipe, and must consider the expenditure for the additional 8 inches of capacity to be warranted by the lessened cost of premiums for fire insurance on the property.
The intent of the law is to give just and rapid compensation to all claimants, and, at the same time, to safeguard the interest of the taxpayers. In the instant matter, it is certain damage has been done to claimant for which he should be compensated, and also true that this is a further illustration that the rights of the individual must, when necessity requires it, yield to the public’s requirements.
The State’s appraiser testified that if he considered claimant’s land had its highest and best use as light industrial property, he would appraise its unit value at $4,000 to $5,000 an acre. The court finds the property to have been worth $4,000 an acre at the time of the taking. ■ Included in this evaluation is an influence for the rezoning — -considered under the circumstances almost as certain as if already determined, but which change carried with it as prerequisites certain costs such as road repair. The court finds that the State’s appraiser was correct in stating there was an upward trend of realty values in the area and an increasing awareness of the advantages flowing from light industrial use of property.
The court finds that the highest and best use of claimant’s property before the appropriation was residential and light industrial, and the highest and best use of claimant’s property after the appropriation was light industrial.
The three attempts made by claimant to reach substitute water sources for the land were reasonable attempts and were necessitated by the State’s taking the water supply available to the land at the time of the taking. Claimant is entitled to reimbursement for these attempts.
The court finds that the fair and reasonable market value of the subject property before the taking was $44,000; that the fair and reasonable market value of the subject property after the taking of the land was $28,740; and that the amount by which the claimant has been damaged is $15,260; of this amount $3,060 represents the direct damage for .765 acre taken.
*760 As the cost to cure damage resulting from the State’s destruction of the water supply, claimant is awarded the sum of $7,500 for the digging of two wells, $900 for temporary pipelines, $1,800 for plastic piping, and $2,000 for the old piping taken at two thirds of its installation cost.
“ The owner’s damages in this case by reason of the loss of water in his well were incident to the construction of the highway and so directly resultant therefrom that compensation for taking his lands for highway purposes without including therewith the damages tó the well as a part of the damages to his remaining land would not be just or an adequate equivalent for his loss.” (County of Erie v. Fridenberg, 221 N. Y. 389 as cited in Easton v. State of New York, 245 App. Div. 439, 441.)
“ We find it inadequate compensation for the damages actually proven, when those arising from severance of the water supply are included, as they must be.” (Klein v. State of New York, 19 A D 2d 569, 570.)
No award is given for circuity of access or loss of access, since it is clear from the evidence that, though access is not possible from as many directions as before the taking, it still is possible to arrive and leave from claimant’s land, even in large trucks though there admittedly is some difficulty in doing so. The court gives full respect to the law as stated by the higher courts that circuity of access resulting from a taking is not compensable in damages.
Nothing is awarded for the old building which burned down, allegedly destroyed because no water was available to fight the fire, since claimant’s appraiser assigned no value to it at the taking date, and the court finds it had none then.
The claimant is awarded the smn of $15,260 for all damages direct and consequential, with interest thereon from March 20, 1962 to September 20, 1962 and from March 13, 1964 to the date of entry of judgment herein.
The court has arrived at its determination independently of the valuations testified to by the experts of each party, but giving full and proper weight and consideration to their testimony and to all the evidence, and the benefit gained by the court’s viewing of the property and the comparables.