Joseph MASCARO and Shelby Taylor, individuals, Plaintiffs and Appellants,

v.

John S. DAVIS, Charley Joseph, Curtis Baum, individuals, and Chatillion, Inc., a Utah corporation, Defendants and Respondents.

No. 19024.

Supreme Court of Utah.

July 6, 1987.

Rehearing Denied Aug. 28, 1987.

Charles W. Hanna, Joseph C. Rust, Salt Lake City, for appellants.

John S. Davis, pro se.

M. Shane Smith, Salt Lake City, Joseph E. Tesch, Heber City, for respondent Charley Joseph.

Duane A. Burnett, Bountiful, for respondents Curtis Baum and Chatillion, Inc.

HALL, Chief Justice:

Plaintiffs obtained a joint and several default judgment against defendants Davis and Joseph and in favor of plaintiff Mascaro for $205,869.16 and plaintiff Taylor for $85,706, as well as for attorney fees, interest, and costs. Plaintiffs seek reversal of (1) an order modifying and setting aside in part plaintiffs' default judgment against defendant Joseph; (2) an order enforcing a settlement agreement; and (3) an order preventing plaintiffs from executing against defendant Joseph's property pursuant to the default judgment.

The discussion in this case involves only a portion of a larger real estate transac-tion. Since the case has never gone to trial, the limited factual background provided below is based for the most part upon the pleadings, filings, and submissions.

I.

Early in 1978, plaintiff Mascaro and defendant Joseph formed a partnership for the purpose of acquiring and developing real property. The partnership's real estate transactions involved an option to buy eighteen acres of land in Lehi, Utah, for $117,000 (Taylor property) and a larger parcel of land contiguous to the Taylor property known as Lehi Meadows. The partnership thereafter attempted to sell the Taylor property and also acted as a real estate agent for Lehi Meadows.

After several potential buyers failed to purchase the properties, defendant Davis, an attorney, contacted Joseph on an unrelated matter. Upon learning of the partnership's real estate venture, Davis represented to Joseph that he could sell the properties. Davis was subsequently hired by the partnership.

In March 1979, the partnership entered into an agreement with Chatillion, Inc., a corporation owned and operated by Curtis Baum. By the terms of the agreement, Chatillion agreed to purchase approximately twenty-nine acres of Lehi Meadows and several options to purchase the remainder of Lehi Meadows and the Taylor property.

In relevant part, Chatillion agreed to pay the partnership approximately $380,000 for the Taylor property (which in turn was to be used by Chatillion as part of its consideration for Lehi Meadows and accompanying options) and as a commission for the sale of Lehi Meadows. Chatillion made cash payments to the partnership totalling $140,937.09 and agreed to convey eight building lots, with a value of $30,000 each, to satisfy the balance owing on the $380,-000 obligation.

Chatillion gave the cash payments to Davis, who placed them in a client trust account. Joseph claimed that he told Davis to distribute $40,000 to Taylor, $20,000 to Mascaro, and $20,000 to Joseph and to re-

tain the remainder until further notice. Davis, however, issued $38,000 to Joseph and embezzled over $100,000 of the money.

After the agreement was entered into, a dispute arose as to whether the eight lots Chatillion was to convey were worth $30,000 each. Moreover, although a closing on the twenty-nine acres of Lehi Meadows and accompanying options took place, the partnership never received title to the eight building lots.

The partnership exercised the Taylor option so it could provide Chatillion with title to the Taylor property. The terms of the option agreement provided that the partnership would pay Taylor in the form of income-producing property. Taylor received partial satisfaction of the option agreement when the partnership provided in excess of $30,000 to buy him a duplex. Taylor then located other property which he wanted the partnership to buy for him to satisfy the remainder of the option agreement. Mascaro personally paid in excess of $10,000 for a partial down payment on this other property. However, since no funds remained in Davis's client trust account with which to pay the remainder of the down payment, the property was foreclosed upon and Mascaro's invested funds were lost.

In their complaint, plaintiffs alleged that Joseph and Davis converted to their own use the $140,000 placed by Davis in the trust account. Plaintiffs further alleged that Joseph and Davis refused repeated requests for an accounting, claiming that the funds were in the trust account and that they had not individually received any funds from the account. Discovery of Davis's bank records proved otherwise, and thereafter Joseph admitted he received $38,000. There is no dispute that Davis embezzled a portion of the funds beginning in June of 1979.

Plaintiffs filed their complaint on May 1, 1980, and Davis and Joseph were both served on May 5, 1980. The following day, Joseph apparently called Davis and requested that Davis take whatever steps were necessary to represent him. Davis told Joseph that everything would be taken care of and "not to worry." Over the next several months, Joseph allegedly spoke repeatedly with Davis concerning the status of the suit. Joseph believed that Davis was taking the proper legal steps to successfully defend the action. Additionally, Davis may have told Joseph's wife that he had filed an answer. In fact, Davis failed to answer the complaint or take any responsive action. Instead, he allowed entry of the default judgment against himself and Joseph on June 5, 1980.

A motion to set aside the default judgment was denied in February 1981 by Judge James Sawaya. Thereafter, Joseph learned of Davis's embezzlement, obtained new counsel, and brought a similar motion before Judge Dean Conder. The motion was denied in January 1982. Joseph again retained new counsel and moved for a stay of execution, which was granted by Judge David Dee in March 1982.

In May 1982, one week prior to trial on plaintiffs' claims and Joseph's cross-claims against Baum and Chatillion, a pretrial conference was held. An agreement was reached, settling most of the claims, between all of the parties.

At the pretrial conference, Baum and Chatillion agreed to tender to the partnership eight lots of real property in Weber County, Utah (also known as Phase III of the Parkvale Subdivision). Taylor agreed to accept four of the eight lots in full satisfaction of his judgment against Joseph and any claims he had against Baum, Mascaro, Joseph, and Chatillion, provided evidence could be produced that the lots in question were each worth $30,000 or more. The agreement also called for Baum and Chatillion to make certain improvements to the lots. Based upon these same terms, Mascaro agreed to accept two of the lots in partial satisfaction of his judgment against Joseph. The final two lots were to be held in escrow, pending a resolution of the remainder of Mascaro's judgment *or* his other claims against Joseph and any cross-claims Joseph might have against Masca-

ro.[1] Finally, all of Mascaro's related claims against Baum and Chatillion were to be dismissed with prejudice. After negotiations to put the settlement agreement into final form were completed, plaintiffs indicated they did not intend to honor the agreement.[2] In November 1982, Judge Dee granted Joseph's motion to enforce the settlement agreement.

Thereafter, Joseph brought a third motion to set aside the default judgment. In January 1983, Judge Dee modified and set aside in part plaintiffs' default judgment, holding that Joseph was not responsible for the embezzlement of the funds from the partnership, that Taylor's claim had been satisfied, that Mascaro's judgment against Joseph was partially satisfied, and that the remainder of Mascaro's judgment should be set aside. This appeal followed.

## II.

Plaintiffs contend that Judge Dee erred by granting Joseph's motion to stay execution of the default judgment. The argument is that the judge's order went beyond the scope of the motion thereby affecting the validity of plaintiffs' judgment. Joseph was properly served with plaintiffs' complaint, and his default thereon was entered pursuant to Utah Rule of Civil Procedure 55(a)(1). Thereafter, judgment was entered in accordance with Utah Rules of Civil Procedure 55(b)(2) and 58A(b). In September 1981, Judge Dee made the default judgment final pursuant to the terms of Rule 54(b).[3]

Joseph's motion for a stay of execution was based upon Utah Rules of Civil Procedure 62(b) and 62(h). Rule 62(h) provides:

When a court has ordered a final judgment on some but not all of the claims presented in the action under the condi-

tions stated in Rule 54(b), the court may stay enforcement of that judgment until the entering of a subsequent judgment or judgments and may prescribe such conditions as are necessary to secure the benefit thereof to the party in whose favor the judgment is entered.

Judge Dee's order granting Joseph's motion to stay the execution provided in pertinent part:

IT IS HEREBY ORDERED:

1. That the U.R.C.P. Rule 62(h) Stay of the Judgment by Default requested by Charley Joseph is hereby granted on the condition that Charley Joseph post bond in the amount of $25,000.00 in property or other assets.

2. That during the period of said Stay, Charley Joseph is ordered not to transfer or alienate any of his property.

3. That this court retains continuing jurisdiction over this case.

4. That although this case has been brought in the posture of a debt owing, as between Joseph Mascaro and Charley Joseph it is, in fact, more correctly viewed as a dissolution of their partnership.

5. That this Court, therefore, intends to treat the matter as a dissolution of said partnership, intending to become fully appressed [sic] of both the partnership debts and partnership assets.

6. That this court intends to [re]quire payment of all the legitimate partnership debts out of the partnership assets; and, to divide the partnership profits equally among said partners. Therefore, all partnership assets [ac]quired by plaintiffs and Charley Joseph are to be preserved until disbursed by Order of this Court.

---

1. As will be explained in section II, the trial court viewed the default judgment against Joseph as being infirm and thus the settlement agreement anticipated further litigation between Joseph and Mascaro.

2. The fact that plaintiffs had not yet signed the settlement agreement is of no legal consequence. *See Murray v. State,* 737 P.2d 1000, 1001 (Utah 1987).

3. Utah Rule of Civil Procedure 54(b) provides in pertinent part:

When more than one claim for relief is presented ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination by the court that there is no just reason for delay and upon an express direction for the entry of judgment.

7. That this court views the embezzlement of approximately $100,000.00 by attorney John S. Davis to be the crux of this dispute.

8. That as John S. Davis was the attorney for the partnership at the time of his embezzlement, each partner will share equally in whatever loss is realized from said embezzlement after John S. Davis' assets have been exhausted through counsels' efforts to execute on the judgments against him.

The requirements of Rule 54(b) were satisfied with respect to Mascaro's and Taylor's claims against Joseph. Therefore, Judge Dee had the power, pursuant to Rule 62(h), to stay execution of the default judgment pending entry of judgment on the collateral claims.

Although the court did not expressly grant this stay based upon Joseph's claims that the judgment was void or voidable,[4] paragraphs 4 through 8 and comments in the corresponding minute entry indicate that Judge Dee viewed the final judgment as being infirm.[5] Since we hold that Judge Dee's subsequent order setting aside the default judgment was an abuse of discretion, *infra* pp. 946–947, we view the contents of paragraphs 4 through 8, which effectively undermine the default judgment as to Joseph, as being in conflict with that

judgment and thus without foundation in the law. We therefore limit the effect of Judge Dee's March 16, 1982 order to paragraphs 1 through 3 of that order.[6]

### III.

■ Plaintiffs contend that the agreement reached at the settlement conference before Judge Sawaya was improperly enforced by Judge Dee due to a failure of conditions. It is a basic rule that the law favors the settlement of disputes.[7] Such agreements under the proper circumstances may be summarily enforced.[8] However, whether a court should enforce such an agreement does not turn merely on the character of the agreement. An agreement of compromise and settlement constitutes an executory accord.[9] Since an executory accord "constitutes a valid enforceable contract," [10] basic contract principles affect the determination of when a settlement agreement should be so enforced.

■ On appeal, plaintiffs do not dispute the validity of the agreement, but rather assert that their failure to perform thereunder was excused because certain conditions precedent to the agreement had not been met. Plaintiffs contend, therefore, that Judge Dee erred in granting the motion to enforce the settlement agreement.[11]

> It is now well established that the trial court has the power to summarily enforce on motion a settlement agreement entered into by the litigants while the litigation is pending before it. Quite obviously, so simple and speedy a remedy serves well the policy favoring compromise, which in turn has made a major contribution to its popularity.
> *Id.* at 609.

4. Joseph alternatively argued that the stay should have been granted because the judgment was void, implying that the stay was proper pursuant to Utah Rule of Civil Procedure 62(b). Although Rule 62(b) allows a court to stay execution of a judgment pending the disposition of a motion for relief pursuant to Rule 60, no such motion was before the court until after Judge Dee ruled on the motion for a stay of execution.

5. The corresponding minute entry provides in pertinent part: "This court intends to retain control of this case, with intent at end of case to resolve issues as much as possible by way of gathering all partnership assets making fair distribution among all parties."

6. *See* R.Utah S.Ct. 30(a).

7. *Murray,* 737 P.2d at 1000; *Alvin G. Rhodes Pump Sales v. Industrial Comm'n,* 681 P.2d 1244, 1248 (Utah 1984); *Rio Algom Corp. v. Jimco, Ltd.,* 618 P.2d 497, 506 (Utah 1980).

8. *Tracy-Collins Bank & Trust Co. v. Travelstead,* 592 P.2d 605, 607 (Utah 1979). Therein, we stated:

9. *L & A Drywall, Inc. v. Whitmore Constr. Co.,* 608 P.2d 626, 629 (Utah 1980) (citing *Cox Constr. Co. v. State Road Comm'n,* 583 P.2d 85, 87 (Utah 1978)).

10. *Lawrence Constr. Co. v. Holmquist,* 642 P.2d 382, 384 (Utah 1982); *see Blackhurst v. Transamerica Ins. Co.,* 699 P.2d 688, 691–92 (Utah 1985).

11. The decision of a trial court to summarily enforce a settlement agreement will not be reversed on appeal unless it is shown that there was an abuse of discretion. *Millerberg v. Steadman,* 645 P.2d 602, 604 (Utah 1982) (and cases

■ Where one party to a settlement agreement fails to fulfill a substantial condition precedent thereto or therein, the other party(s) is excused from performance.[12] Although the agreement itself is silent on the point, the parties' papers indicate that Baum and Chatillion were required as part of the settlement to provide documentary evidence showing that the lots each had a value of $30,000 or more. Further, both Joseph and plaintiffs agree the requirement was a condition precedent to the agreement. The dispute lies in whether the condition was fulfilled. Plaintiffs claim that Chatillion's documentation failed to substantiate the required valuation. However, plaintiffs have not indicated where that documentation is located in the record. Moreover, there is no transcript in the record of the hearing before Judge Dee. We have previously indicated that when crucial matters are not in the record, the missing portions are presumed to support the trial judge.[13] The only documentation in the record which appears relevant to the value of the property is an appraisal covering Phase I of the Parkvale Subdivision and a letter, dated June 23, 1982, written by plaintiffs' attorney to Joseph's attorney. This letter stated in pertinent part:

From the evidence which you have provided to us, it appears to my clients that the property submitted by Curtis Baum probably does have a value roughly approaching $30,000 each. We agree that Curtis Baum has been [sic] probably met his obligation and that it would be reasonable to release him from the lawsuit upon the proper tender of said lots.

Due to the long delay in getting verification from Baum, however, both Shelby Taylor and Joe Mascaro are now unwilling to take the unimproved lots offered by Curtis Baum as a satisfaction of the respective judgments.

In light of this evidence and the insufficiency of the record, we cannot hold that the trial court abused its discretion.

■ Plaintiffs further contend that the agreement called for certain improvements to be made to the lots. They claim that completion of these improvements constituted conditions precedent which were not fulfilled. Specifically, plaintiffs claim the improvements noted in the following portion of the agreement were not completed:

[T]he following improvements have been completed or shall be completed no later than the date indicated herein below in this paragraph:

a. That piped, culinary water has been extended to each of the above specified lots.

b. That the asphalt surfaced road called for in Phase III, Parkvale Subdivision plat, as approved by Weber County, shall be completed to each of the above specified lots on or before August 2nd, 1982. There presently is a lien on each lot in favor of Weber County to ensure completion of said asphalt roadways; Baum and Chatillion agree to substitute a cash bond in favor of Weber County in lieu of the present lien and to obtain from Weber County a release of said lien on lots 57, 58, 59, 60, 61, 62, 47 and 48. Evidence of substitution of said cash bond and the release of lien by Weber County shall be delivered to all parties no later than the execution of this Agreement.

c. That a chain link fence, as specified in the subdivision plat as approved by Weber County, shall be completed across the east property line of lots 57, 58, 59, 60, 61, and 62 on or before August 2nd, 1982. Further, Baum and Chatillion represent that the contract for the erection of said fence has been let, and in fact, payment in full has been made to the contractor for the completion of said

cited therein); see Bambrough v. Bethers, 552 P.2d 1286, 1290 (Utah 1976).

**12.** Bunker Hill Co. v. United Steelworkers of Am., 107 Idaho 155, 157, 686 P.2d 835, 837 (1984); Aritex Land Co. v. Baker, 14 Ariz.App. 266, 275, 482 P.2d 875, 884 (1971); In re Massa-

pequa in Town of Oyster Bay, 50 Misc.2d 91, 269 N.Y.S.2d 830, 833 (N.Y.Sup.Ct.1966); Davego, Inc. v. O'Brien, 11 Misc.2d 703, 175 N.Y.S.2d 252, 254 (N.Y.Sup.Ct.1958).

**13.** See Chapman v. Chapman, 728 P.2d 121, 123 (Utah 1986).

fence. A letter from the said contractor affirming receipt of payment in full for the erection of said fence, including all materials and all labor, and specifying a completion date no later than August 2nd, 1982, shall be delivered to each party hereto no later than the execution of this Agreement.

d. That irrigation ditches as specified in Phase III, Parkvale Subdivision plat, and as approved by Weber County, shall be provided to each of the above specified lots on or before July 15, 1982. Further, that each lot shall be guaranteed the use of ⅙ share of water in the West Warrant Water Company, under a ninety-nine year master lease in favor of the Parkvale Home Owners Association, and that each lot shall be assessed for no more than its pro-rata share of the annual costs of said lease, reasonable costs of maintaining irrigation ditches in common, and a reasonable fee to a water master appointed by the Parkvale Home Owners Association. Assessment for current years is Four dollars ($4.00) per lot.

The improvements relied upon by plaintiffs do not rise to the level of conditions precedent to enforcement of the agreement. This conclusion is necessitated by that portion of the agreement providing that "the following improvements *have been completed or shall be completed* no later than the date indicated herein." (Emphasis added.) A fair reading of this language indicates that failure to complete the improvements was not an event which the parties intended would prevent enforcement of the settlement agreement.

Moreover, the settlement agreement as enforced expressly provided for this contingency (that the improvements might not be made) by allowing Mascaro, Joseph, and Taylor to obtain judgments against Baum and Chatillion in an amount necessary to complete any of the improvements not made.[14] However, neither Taylor nor Mascaro availed himself of this remedy, and consequently, there is no evidence in the record to support the contention beyond the inferences arising from the enforcement order.

■ We have held that matters not raised at the trial court level will not be considered by this Court on appeal,[15] particularly when the problem could have been resolved below.[16] The policy behind this rule is applicable here where the contingency that the improvements might not be completed was contemplated below and the remedy given therefor was not pursued. As we stated in *Millerberg v. Steadman,*

The settlement agreement in this case was entered into in the presence of the trial court. There is no claim of fraud or imposition. The unresolved issues now relied on were, for the most part, not presented to the trial judge as an obstacle to the performance of the agreement. Under the circumstances of this case, ... the trial judge acted within the ambit of necessary discretion in summarily enforcing the settlement agreement.[17]

The dissent views Judge Dee as having rewritten the parties' settlement agreement. However, the settlement agreement provided that Baum and Chatillion would make the noted improvements on or before the dates quoted above. The parties clearly intended the agreement to be binding once Baum and Chatillion established the value of the lots. Moreover, once that agreement was binding, it provided that Baum and Chatillion would be released from liability; the agreement clearly indi-

---

**14.** Joseph's enforcement motion, which was later joined by Baum and Chatillion, requested the terms of the enforced agreement be that the claims against Baum and Chatillion be dismissed without prejudice and thereafter be dismissed with prejudice if Baum, upon proof within sixty days, made the required improvements. The motion further requested that should such improvements not be made, judgments be entered in favor of the grantees in an amount necessary to complete the improvements. The trial court's enforcement order followed this format except for the initial entry of a dismissal without prejudice.

**15.** *E.g., Lane v. Messer,* 731 P.2d 488, 491 (Utah 1986).

**16.** *Cf. Condas v. Condas,* 618 P.2d 491, 495 n. 8 (Utah 1980).

**17.** 645 P.2d 602, 604 (Utah 1982) (citations omitted).

cates the parties contemplated that the improvements might not be made at the time Baum and Chatillion were released from liability. However, on June 23, 1982, plaintiffs' attorney wrote the letter quoted above, *supra* p. 943, indicating his clients' reluctance to go through with the agreement. This letter was dated prior to the time the improvements were required to have been made. In light of the various cross-claims against Baum and Chatillion, it is understandable that they may have delayed making improvements since plaintiffs were attempting to back out of the agreement. Judge Dee's order did not excuse the nonperformance, but rather merely enforced the parties' agreement and established deadlines for completion of the improvements. Judge Dee, by allowing plaintiffs to come back into court, without trial, and obtain judgments for any improvements not timely completed by Baum and Chatillion, bestowed a benefit upon plaintiffs which they were not afforded under their original agreement. As indicated, plaintiffs never availed themselves of the remedy. Indeed, there is no evidence in the record of what improvements, if any, might have been made prior to or after Judge Dee's order.

█ Also, we disagree with plaintiffs' claim that they should be afforded relief because Chatillion and the Weber County properties are now involved in bankruptcy. The "Notice of Automatic Stay" was dated almost five months after Judge Dee ordered the parties to comply with the agreement. Plaintiffs cannot rely on this turn of events regarding Baum and Chatillion to avoid the agreement.[18] Since plaintiffs have failed to show that Judge Dee abused his discretion in enforcing the agreement, we will not reverse the November 5, 1982 order.

## IV.

Plaintiffs finally contend that Judge Dee erred in concluding that Taylor's default judgment against Joseph had been satisfied and in setting aside Mascaro's default judgment against Joseph for all amounts in excess of $60,000. Further, they claim that the court erred by finding that the $60,000 owed was satisfied by Mascaro's receipt of the two lots.

Utah Rule of Civil Procedure 55(c) provides that a default judgment may be set aside in conformity with Rule 60(b).[19] Joseph sought relief pursuant to Rule 60(b) on three occasions before three different judges. Joseph's motions were denied in the first two proceedings. Even if we do not consider the original motion before Judge Sawaya, where Joseph was still being represented by Davis, Judge Dee erred in setting the remainder of the default judgment in favor of Mascaro aside since Judge Conder had previously denied the same motion.[20]

18. *See In re Estate of Chasel,* 725 P.2d 1345, 1348 (Utah 1986).

19. Utah Rule of Civil Procedure 60(b) provides: On motion and upon such terms as are just, the court may in the furtherance of justice relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence whic'i by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) when, for any cause, the summons in an action has not been personally served upon the defendant as required by Rule 4(e) and the defendant has failed to appear in said action; (5) the judgment is void; (6) the judgment has been satisfied, released, or discharged, or a

prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (7) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time and for reasons (1), (2), (3), or (4), not more than three months after the judgment, order, or proceeding was entered or taken. ... This Rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding or to set aside a judgment for fraud upon the court. The procedure for obtaining any relief from a judgment shall be by motion as prescribed in these Rules or by an independent action.

20. Since we uphold the settlement agreement, it follows that the judge did not err by declaring Taylor's judgment and $60,000 of Mascaro's judgment satisfied.

In his motion before Judge Conder, Joseph argued he was entitled to relief pursuant to Rule 60(b)(7) because the

> default judgment ... was taken against [defendant] Joseph through the fraud, misconduct, and intentional neglect and violation of fiduciary duty by Davis, Joseph's attorney, whose actions of embezzlement placed his interest in opposition to Joseph's. As a result of this fraud perpetrated by co-defendant Davis, defendant Joseph has been denied a fair opportunity to have his position heard on its merits.

Pursuant to this motion, Judge Conder held the only evidentiary hearing involving the instant case. In concluding the hearing, the judge correctly noted that Rule 60(b)(7) may not be used as an end-run around the temporal limitations of Rule 60(b)(1) through (b)(4).[21] Also, in denying Joseph's motion, Judge Conder stated:

> Mr. Joseph, sir, if we had a lawsuit pending before me now and based on this evidence ... you may very well have a very legitimate claim against Mr. Davis but I'm hard put on two things.
>
> One: you knew the lawsuit was pending in 1980 and here it is 1982 and that's almost two years that have gone by since that time. I understand that you've had negotiations and tried to work it out. But I have a very difficult time because the law says let's put these things to rest within a certain time element and sets up statutes of limitation and says in a lawsuit it can be brought and can't even be brought after certain times because of this. We say that you can't bring a

motion for mistake, inadvertence, surprise or excusable neglect or newly discovered evidence or fraud after three months after judgment has been entered.

> And it seems to me those are all of the elements that we are talking about here. And that he knew or should have known that Mr. Davis was not doing the job for him that he thought he was. He was relying upon negotiations taking place without protecting his lawsuit that was pending at that time. He knew the lawsuit was pending and then the fact that the court has already ruled on it, I have some grave difficulty. The only thing I can do is deny the motion.

The default judgment was made final September 4, 1981, for purposes of appeal. It is well settled that an order denying relief pursuant to Rule 60(b) is generally a final appealable order.[22] However, Joseph did not then appeal from Judge Conder's ruling, which was reduced to a signed order on January 28, 1982. And although he filed a notice of intent to appeal, he has not filed a cross-appeal concerning Judge Conder's ruling. Instead, Joseph filed his third motion to set aside the default judgment on April 16, 1982. In this final motion, Joseph relied on Rule 60(b)(7), again claiming in pertinent part that Davis had perpetrated a fraud on the court (which effectively denied Joseph due process). Judge Dee agreed and granted Joseph's motion.

■ We have repeatedly indicated that one district court judge cannot overrule another district court judge of equal authority.[23] This branch of what is gener-

---

**21.** *Laub v. South Cent. Utah Tel. Ass'n,* 657 P.2d 1304, 1308 (Utah 1982); *Gardiner & Gardiner Builders v. Swapp,* 656 P.2d 429, 430 (Utah 1982); *Calder Bros. Co. v. Anderson Signs, Inc.,* 652 P.2d 922, 926 (Utah 1982). In *Laub,* we stated:

> This rule brings into conflict competing interests in the finality of judgments and relief from inequitable judgments. A motion to modify a final judgment is addressed to the discretion of the trial court.... [The court's determination] may be reversed only upon a showing that this discretion was abused....
> ... Subdivision (7) is the residuary clause of rule 60(b); it embodies three requirements: First, that the reason be one *other* than those listed in subdivisions (1) through (6); second,

that the reason justify relief; and third, that the motion be made within a reasonable time. 657 P.2d at 1306–07 (emphasis in original).

**22.** 7 J. Moore & J. Lucas, *Moore's Federal Practice & Procedure* ¶¶ 60.29, 60.30[i], [3] (1985 & Supp. 1986–87).

**23.** *In re Estate of Cassity,* 656 P.2d 1023, 1025 (Utah 1982); *Madsen v. Salt Lake City School Bd.,* 645 P.2d 658, 664 (Utah 1982); *State v. Bero,* 645 P.2d 44, 46 (Utah 1982); *Harris v. Tanner,* 624 P.2d 1135, 1137–38 (Utah 1981); *State v. Morgan,* 527 P.2d 225, 226 (Utah 1974); *Harward v. Harward,* 526 P.2d 1183, 1184 (Utah 1974). *See also Johnson v. Johnson,* 560 P.2d 1132, 1134 (Utah 1977).

ally termed the "law of the case" doctrine has evolved to avoid the delays and difficulties that arise when one judge is presented with an issue identical to one which has already been passed upon by a coordinate judge in the same case.[24] Accordingly, even if, as stated by Judge Dee, Judge Conder "for reasons of judicial economy, relinquished all authority and jurisdiction in the matter," Judge Dee could not overrule Judge Conder's order.

This holding is consistent with Utah Code Ann. §§ 78–7–19 and –20 (1977). Section 78–7–19 provides:

> If an application for an order, made to a a judge of a court in which the action or proceeding is pending, is refused in whole or in part, or is granted conditionally, no subsequent application for the same order can be made to any other judge, except of a higher court; but nothing in this section applies to motions refused for any informality in the papers or proceeding necessary to obtain the order, or to motions refused with liberty to renew the same.

Utah Code Ann. § 78–7–20 (1977) provides that an order made contrary to section 78–7–19 may be vacated by a judge of the court in which the action or proceeding is pending.

Joseph filed an independent action wherein he claims that Davis perpetrated a fraud upon the court which prevented him from having a fair opportunity to litigate the case on the merits.[25] Although Judge Dee allowed the action to be consolidated with the instant case, a February 1983 order stayed the action pending the outcome of this appeal. Thus, that action is not properly before us, and we therefore do not rule on that action.

The case is remanded for further proceedings as to Joseph's independent action, which, if successful, may operate to set aside the remainder of Mascaro's judgment against Joseph. Each party is to bear his own costs.

I. Daniel STEWART, Associate C.J., concurs.

ZIMMERMAN, Justice: (concurring).

I join in the majority's disposition of the case, except that with respect to the issue discussed under part III that pertains to the failure of Baum and Chatillion to make certain improvements in the lots, I join only in that portion of the majority opinion that declines to reach the issue because Mascaro and Taylor did not adequately preserve the issue for appeal. I do not join in that portion which states, as an alternative ground for disposing of the issue, that the failure to make these improvements cannot constitute a defense to an enforcement proceeding. This is unnecessary to a disposition of the appeal.

DURHAM, J., concurs in the concurring opinion of ZIMMERMAN, J.

HOWE, Justice: (concurring and dissenting).

I concur in the Court's opinion except in that part holding that Taylor's judgment was wholly satisfied and that Mascaro's judgment was partially satisfied by the conveyance of the Weber County lots. As to that part of the Court's opinion, I dissent.

The settlement agreement required that Baum and Chatillion should make certain improvements to the lots. An asphalt road was to be completed to each of the lots by August 2, 1982. Chain link fencing was to be installed and paid for by the same date. Irrigation ditches were to be provided to each of the lots by July 15, 1982, and each lot was to be guaranteed the use of one-sixth of a share of water in an irrigation company. While I agree with the majority that the completion of these improvements were not conditions precedent to the settle-

---

24. *Sittner v. Big Horn Tar Sands & Oil, Inc.,* 692 P.2d 735, 736 (Utah 1984).

25. *See McGavin v. McGavin,* 27 Utah 2d 200, 202, 494 P.2d 283, 284 (1972) (citing *Shaw v. Pilcher,* 9 Utah 2d 222, 224, 341 P.2d 949, 950 (1959)). We have previously held that the bringing of an independent action is a prerequisite to relief based upon a claim of fraud upon a court.

948

ment agreement, they were material terms of the agreement and constituted part of the consideration to be received by Taylor and Mascaro.

The improvements were not made. Nevertheless, in November 1982, Baum and Chatillion brought a motion before Judge Dee to enforce the settlement agreement. Judge Dee, for reasons which do not appear in the record, excused the non-performance of Baum and Chatillion, enforced the settlement agreement against Taylor and Mascaro, but rewrote their agreement to give Baum and Chatillion another sixty days to make the improvements, and if they failed again to do so, Taylor and Mascaro could sue them and obtain a judgment for damages.

Judge Dee's enforcement order was contrary to a principle of the law of contracts that a party in default cannot demand performance of the other contracting party. Taylor and Mascaro did not bargain for a judgment against Baum and Chatillion. They bargained for improved lots. The improvements to be made were set out in detail in the agreement, and a timetable was established. When Baum and Chatillion did not install the improvements, Taylor and Mascaro were not legally obligated to accept unimproved lots and then be put to the expense and trouble of a lawsuit to recover damages for the missing improvements. The majority glosses over the fact that the improvements were not constructed by stating that Taylor and Mascaro were given the right to sue Baum and Chatillion, but failed to "avail themselves of this remedy." Of course, they failed to pursue that remedy. It was not what they had bargained for. The trial judge had no right to alter the performance required by the contract.

I cannot subscribe to the statement in the majority opinion and in the concurring opinion that this issue of uncompleted improvements was not raised in the trial court. As proof that the issue was raised, we have the trial judge's order that recognized that the improvements had not been constructed in accordance with the settlement agreement, but erroneously gave

Baum and Chatillion sixty days from the date of the order to complete them. However, if they were not completed within that time, Taylor and Mascaro still had to accept the lots in their unimproved state and were given the dubious right to sue Baum and Chatillion for the value of the missing improvements.