2004 UT App 419

**In the Matter of the ADOPTION OF E.H., a minor.**

**T.H., Appellant,**

v.

**R.C. and S.C., Appellees.**

**No. 20030780–CA.**

Court of Appeals of Utah.

Nov. 18, 2004.

Linda Faye Smith, Salt Lake City, for Appellant.

Melvin G. Larew, Draper, and Gregory P. Hawkins and Rick L. Sorensen, Hawkins & Sorensen, Murray, for Appellees.

Before Judges BENCH, ORME, and THORNE.

## OPINION

ORME, Judge:

¶1 T.H. appeals the trial court's ruling that the parties' stipulation for evaluation and final resolution of a contested adoption would not be enforced. We reverse and remand.

## BACKGROUND

¶2 Faced with an unplanned pregnancy, T.H. contacted the Adoption Law Center, a California law office, in the fall of 2000, to explore the option of placing her unborn child for adoption. Around the same time, a Utah couple (the Cs) hired Families for Children, a licensed Utah child placement agency, to perform a home study of their family so as to be eligible to adopt a child. Suzanne Stott, Director of Families for Children, handled the home study, which she based on a

family group interview she conducted in the Cs' home. Stott submitted her report on the Cs to the Families for Children adoption panel and recommended approval of the family as eligible to adopt. The panel approved the Cs for adoption privileges.

¶ 3 On November 14, 2000, the Cs, who are Caucasian, contacted the Adoption Law Center and expressed interest in adopting an African–American baby. They sent a letter to the Adoption Law Center that described their family, which an employee subsequently read over the telephone to T.H. The employee then arranged for T.H. and the Cs to talk via telephone. After their conversation, they informed the Adoption Law Center that they wished to arrange for the Cs' adoption of T.H.'s expected baby. The Cs retained Families for Children to provide adoptive services to T.H. and to take her relinquishment for the adoption.

¶ 4 On November 24, 2000, T.H. flew to Utah and gave birth to her baby three days later. On November 29, T.H. signed a document relinquishing her parental rights and granting custody of the child to Families for Children.

¶ 5 T.H. and her other two children lived with the Cs for approximately two and one-half months following the birth. During the course of her stay at the Cs' home, and after close observation of the family, T.H. became concerned with the way the Cs were raising their children. She concluded that the home study evaluation conducted by Stott, which was the basis for Families for Children's decision to approve the Cs to adopt and was influential in T.H.'s decision to select the Cs to adopt her baby, inaccurately described the Cs' family and the way the Cs were raising their children.[1]

¶ 6 The evaluation reported that two of the C children were honor students. However, T.H. noted that the children were actually home schooled, were far from "honor students" in any usual sense of the term, and appeared to be delayed in their education for their ages. She also noted that the children appeared to have no healthy relationships outside the family and that the children with disabilities seemed to be totally isolated from the rest of the family.[2] T.H. was particularly surprised that the ten-year-old with Down syndrome was still in diapers, as her own Down syndrome brother had been out of diapers since age three.

¶ 7 Based upon these postrelinquishment concerns, T.H. moved out of the Cs' home and filed a verified petition for custody of her child. Shortly thereafter, the Cs filed a petition for adoption. The court consolidated both the custody case and the adoption case on joint motion of the parties.

¶ 8 On August 31, 2001, the Cs filed a motion to dismiss T.H.'s petition, to which T.H. timely responded. In October 2001, T.H. filed a motion for summary judgment. Instead of waiting for the court to rule on the motions, the two sides, both represented by counsel, agreed to stipulate to a final resolution of the case. The stipulation provided that a clinical psychologist "shall determine what custody arrangement or decree of adoption should be ordered and whether any order for visitation or other contact should also be entered in this case." The parties further stipulated to "be bound by the recommendation(s) of the [clinical psychologist] and said recommendation(s) may be entered as the Judgment(s) of this Court without further proceedings." Based upon this stipulation, Judge Taylor entered an order approving and implementing the stipulation, and authorizing the appointment of a clinical psychologist to conduct the evaluation and recommend "an equitable and just outcome to promote the best interests of the infant." The parties ultimately appointed Dr. Chris Wehl, "a psychologist with expertise in con-

---

1. T.H. also claimed to have been misled about Mr. C's "alcohol problem," and indeed Mrs. C "acknowledged that her husband was a recovering alcoholic," but Judge Jones specifically found that T.H. had not been misled on this point. Judge Jones also found that T.H. was not *materially* misled by Mrs. C's exaggeration of her professional credentials. (Mrs. C represented herself to T.H. as a "nurse," but was actually a "certified nurse assistant," having completed the six-month course in three weeks time.)

2. At the time, the Cs had five children between the ages of ten and seventeen, all of whom were adopted, and some of whom had disabilities.

ducting custody evaluations," to evaluate the issues in this case.

¶ 9 Approximately one year after the parties appointed Dr. Wehl to evaluate the case, Dr. Wehl completed the custody evaluation.[3] He concluded that the Cs' petition for adoption should be dismissed and that the child should be returned to T.H. T.H. filed a motion to adopt the evaluator's recommendation, dismiss the Cs' adoption petition, and grant custody to T.H. immediately. The Cs objected to this motion and to the custody evaluation, asserting that the custody evaluation "contains factual inaccuracies and may be biased as a result of a conflict of interest." Judge Jones, who replaced the recently retired Judge Taylor as the judge responsible for this case, determined that it would be inappropriate to adopt Dr. Wehl's recommendations.[4] At a later evidentiary hearing, convened to determine whether T.H. could legally revoke her consent, Judge Jones granted the Cs' petition for adoption. T.H. appeals.

## ISSUES AND STANDARD OF REVIEW

¶ 10 T.H. argues that Judge Jones erred in ignoring the parties' stipulation and deviating from Judge Taylor's order implementing the stipulation. Issues involving the deviation from prior orders are ordinarily reviewed under an abuse of discretion standard. *See Mascaro v. Davis*, 741 P.2d 938, 942, 946–47 (Utah 1987).

## ANALYSIS

¶ 11 Judge Jones voided the stipulation between the parties, reasoning that—although they had in fact agreed to be bound by the findings and recommendation of Dr.

Wehl—the court "does not believe it is in the best interest of the baby to enforce the stipulation." T.H. argues that the parties' stipulation was indeed a binding settlement agreement that should have been enforced by the court. Accordingly, the central issue in this case turns on whether it was an abuse of discretion for Judge Jones to refuse to adopt the recommendation of Dr. Wehl, especially given that Judge Taylor had expressly approved the stipulated arrangement which culminated in the recommendation.

¶ 12 The Utah Supreme Court has stated that "[i]t is a basic rule that the law favors the settlement of disputes." *Mascaro*, 741 P.2d at 942. Such "[s]ettlements are favored in the law, and should be encouraged, because of the obvious benefits accruing not only to the parties, but also to the judicial system." *Tracy–Collins Bank & Trust Co. v. Travelstead*, 592 P.2d 605, 607 (Utah 1979). Moreover, the Court noted, "so simple and speedy a remedy serves well the policy favoring compromise, which in turn has made a major contribution to its popularity." *Id.* at 609 (internal quotations and citation omitted). Thus, "the trial court has power to summarily enforce on motion a settlement agreement entered into by the litigants while the litigation is pending before it." *Id.* (internal quotations and citation omitted).

¶ 13 The determination of whether to enforce a settlement agreement is governed by "basic contract principles." *Mascaro*, 741 P.2d at 942. The *Mascaro* Court noted that "whether a court should enforce such an agreement does not turn merely on the character of the agreement." *Id.* Rather, a settlement agreement "constitutes an executory

---

3. There is no question that Dr. Wehl submitted a thorough evaluation. He clearly exercised great care and appropriate professional judgment in undertaking the evaluation. At the same time, a year in the life of an infant is a very long time, and the need for greater haste should have been apparent, particularly if there was any possibility the recommendation would be to restore the child to T.H. While taking a full year to complete the work seems questionable, we note that, during the course of Dr. Wehl's work, neither side complained to the court about how long it was taking and neither side asked the court to set a deadline for completion of the evaluation.

4. Judge Jones concluded that the stipulation was unenforceable because Dr. Wehl's evaluation was flawed. He based this determination on the opinions of the Cs, Suzanne Stott, Dr. Matthew Davis, and J. Neil Birch, a licensed sociologist, who posited that the best interests of the child would be served by adoption. Other grounds for Judge Jones's decision included the amount of money the Cs spent on the adoption and related legal proceedings, the fact that Dr. Wehl's professional practice focused more heavily on custody in divorce proceedings than adoption cases, and Dr. Wehl's choice of guidelines in undertaking the evaluation.

accord. Since an executory accord 'constitutes a valid enforceable contract,' basic contract principles affect the determination of when a settlement agreement should be so enforced." *Id.* (footnotes and citations omitted).

¶ 14 Given the background of this case, it is clear that both sides intended for the stipulation to be a binding settlement agreement. Each had much to lose in forging ahead to a purely legal resolution, and each had, to their credit, the desire to do what was best for the child. At the same time, each side recognized its own lack of objectivity and the wisdom of trusting a neutral professional to make a sound recommendation to the court. The stipulation to which they agreed specifically had as its goal not just the resolution of litigation, but advancing "the best interests of the infant." [5]

¶ 15 Prior to the time the parties entered into the stipulation, both sides had submitted winner-take-all motions. T.H. had filed a verified petition for custody, seeking to prevent the Cs from adopting the child because of her concerns about the child's welfare under the Cs' care. Around the same time, the Cs sought closure in the adoption matter and filed a petition for adoption and a motion to dismiss, averring that the child would fare better in the Cs' home than in T.H.'s home. Instead of pursuing these motions to their respective ends, however, both parties prudently agreed to abandon their claims against one another and stipulated to an

evaluation and final resolution of the case.[6] The stipulation provided, in part, for a neutral custody evaluator, which both parties would agree upon—as they ultimately did—to determine who should exercise parental rights over the child.

¶ 16 The stipulation is valid under basic contract principles, and the Cs do not argue otherwise. Rather, the Cs appear to concede that under general principles of contract, settlement, and stipulation, the order entered by Judge Jones and challenged in this appeal cannot be sustained. Instead, they argue that the stipulation is invalid on other grounds, and that Judge Jones's order invalidating it should be affirmed on the basis of other criteria. We address each of the Cs' assertions in turn, while noting with admitted skepticism that none of these concerns about the validity of the stipulation or enforceability of Judge Taylor's order based thereon were raised by the Cs with the trial court until *after* Dr. Wehl had made his recommendation in favor of T.H.

¶ 17 First, the Cs argue that the stipulation was invalid when entered into because it impermissibly vested a nonjudge, Dr. Wehl, with final decisionmaking authority. While a court is prohibited from delegating its "core judicial function[s]," such as entering final orders and judgments, it is not prohibited from employing individuals to aid the court in its role as decision maker. *Salt Lake City v. Ohms,* 881 P.2d 844, 848 (Utah 1994).[7] The Utah Supreme Court has recog-

---

5. Thus, the stipulation and Judge Taylor's implementing order pose none of the evils that could arise in settling litigation of this sort, e.g., compromise induced by the payment of cash; or resolution on the basis of a legal standard other than the best interests of the child, such as on the basis of which family has the greater net worth or is more devoutly religious; or entrusting the recommendation not to a clinical psychologist with expertise in custody evaluations, but to a welder or astrophysicist.

6. The stipulation outlines the rights forfeited by both parties and imposes related obligations on them:

 [T.H.] having waived any right to proceed on her claim to set aside the relinquishment for fraud, constructive fraud, violation of procedures, breach of contract, or for any other good cause in light of the parties' Stipulation,

 it is hereby ordered that she shall not challenge the Judgment in this case or in the adoption case on the basis of such claims. [The Cs] and Families for Children having waived any right to object to or challenge the propriety or enforceability of a Judgment for post-adoption contact in this case in light of the parties' Stipulation, it is hereby ordered that they shall not challenge such an order or Judgment for post-adoption contact should such an order or Judgment be recommended.

7. The Court in *Salt Lake City v. Ohms,* 881 P.2d 844 (Utah 1994), described certain powers as nondelegable core judicial powers. The Court explained that "[t]he term 'judicial power of courts' is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation." *Id.* at 849 (citations omitted). *See, e.g., Holm v. Smilowitz,* 840 P.2d 157, 165 (Utah Ct.App.1992).

nized that a trial court may "utilize referees, court commissioners, and other assistants for various purposes." *Id.* Here, the Cs fail to distinguish between the circumstances that prohibit a court from delegating its core judicial functions to a nonjudge and those that permit a court to utilize an expert assistant to aid in the judicial process.

¶ 18 In *Ohms*, the defendant was charged with providing false or misleading information to a police officer. *See id.* at 846. Prior to his trial, the defendant signed a consent form in which he "consented to have his case tried and final judgment entered by a circuit court commissioner." *Id.* The Court held that the commissioner could not serve as a de facto judge and perform core judicial functions, such as entering final orders and judgments or imposing sentence. *See id.* at 851. However, the Supreme Court specifically noted that its ruling did not prohibit a commissioner from aiding the court in a variety of other functions, including "mak[ing] recommendations to the court regarding any issue in domestic relations and spouse abuse cases" or "conduct[ing] hearings with parties and their counsel present ... for the purpose of submitting recommendations to the court." *Id.* at 851 n. 17 (second alteration in original) (internal quotations, emphasis, and citation omitted). Clearly, the Court recognized the propriety of judges relying upon nonjudicial recommendations in appropriate cases.

¶ 19 In this case, at the parties' behest, Judge Taylor entered an order approving and implementing the parties' stipulated arrangement for settling their dispute while advancing the child's best interest. At the center of this arrangement was their mutual pledge to rely upon a licensed clinical psychologist to recommend custody arrangements and/or a decree of adoption. While the parties agreed to be bound by the recommendation, the court still retained the ultimate authority to enter the final order of the court. Unlike in *Ohms*, where the commissioner presided over the trial and entered the judgment of the court, Dr. Wehl had no power to enter an order. Rather, Dr. Wehl's only assignment entailed conducting an unbiased evaluation and making recommendations relative to the best interests of the child. The parties contracted to abide by those recommendations and to waive all claims inconsistent therewith. The court held the ultimate authority to preside over the proceedings, to make sure the recommendations were properly arrived at, and to enter the final order.[8] Of course, the stipulation of the parties waiving their respective claims and defenses and indicating they would be bound by the recommendations of the evaluator, and the court's approval of the arrangement, did restrict the usually unfettered prerogative of the court to ignore a mere recommendation.

¶ 20 Second, the Cs maintain that the stipulation was invalid because it caused the parties to stipulate to an "erroneous legal standard." The Cs assert that section 78–30–4.16 of the Utah Code expressly requires that it first be determined whether T.H. could show the grounds necessary to revoke her relinquishment of rights before determining what would be in the best interests of the child. The Cs argue that the parties stipulated to an erroneous legal standard by agreeing to have an evaluator determine what custody arrangement would be best for

Nondelegable judicial powers include "the authority to hear and determine justiciable controversies[;] ... the authority to enforce any valid judgment, decree or order[;] ... [and the] power[] that [is] necessary to protect the fundamental integrity of the judicial branch." *Ohms*, 881 P.2d at 849 (internal quotations and citations omitted).

8. The Cs argue that Judge Taylor agreed to be impermissibly bound by Dr. Wehl's recommendation. However, the stipulation mandated that Dr. Wehl conduct his evaluation "in accordance with [the best interests of the child], in accordance with best practices in custody and adoption studies and evaluations, and as counsel shall specifically request." If Dr. Wehl had conducted the evaluation in a manner that subverted the best interests of the child, departed from the best practices in custody and adoption studies and evaluations, deviated from counsel's specific requests, or otherwise varied from the provisions of the stipulation, Judge Taylor of course retained the authority to deviate from Dr. Wehl's recommendation. As his successor, Judge Jones likewise had this same authority to make sure the terms of the stipulation had been faithfully implemented and to deviate from Dr. Wehl's recommendations if it became clear the stipulation had been breached.

the child without having the court address whether T.H.'s original relinquishment was valid. Section 78-30-4.16 contains no such express requirement.[9] *See* Utah Code Ann. § 78-30-4.16 (2002). Regardless, the case before us does not require us to address whether, in the ordinary case, the validity of a relinquishment must be determined before the best interests of the child are determined. This is because the Cs failed to raise this argument when T.H. first contested the adoption, and subsequently waived the right to raise it by entering into the stipulation and agreeing to be bound by the recommendations of the evaluator. The Cs cannot now renege on their obligation to accept the recommendation of the evaluator, raising an argument they waived by entering into the stipulation, solely because they do not agree with Dr. Wehl's recommendation. Similarly, Judge Jones's determination that "whether or not the Relinquishment was valid must be determined before the best interest of the child is determined," while generally true,[10] is incorrect in this case, where the validity of the relinquishment was put in issue and the parties, by stipulation, then waived their respective claims concerning the validity of the relinquishment. In other words, the stipulation is not invalid because it permitted resolution of the case without determining whether the relinquishment was enforceable. Instead, the enforceability of the relinquishment was among the issues swept away by the parties' stipulation and their decision to compromise their mutually inconsistent legal theories by having the case resolved in the best interests of the child, as evaluated by a neutral expert.

■ ¶ 21 In the Cs' final argument opposing the validity of the settlement stipulation, they argue that, notwithstanding the law of the case doctrine, Judge Jones properly departed from Judge Taylor's prior order. T.H. argues, on the other hand, that in light of the law of the case doctrine, Judge Jones was bound by Judge Taylor's prior order and was powerless to deviate from it.

■ ¶ 22 While T.H.'s rigid view of the doctrine is often advanced by parties who would benefit from its application, we reiterate that the law of the case doctrine is a flexible principle–not an absolute limit on the court's power nor " 'an inexorable command that rigidly binds a court to its former decisions.' " *Gillmor v. Wright,* 850 P.2d 431, 439 (Utah 1993) (Orme, J., concurring) (citations omitted). Rather, it "merely expresses the practice of courts generally to refuse to reopen what has been decided." *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). "The law of the case doctrine is not a limit on judicial power, but only a practice designed 'to protect both court and parties against the burdens of repeated reargument by indefatigable diehards.' " *Gillmor,* 850 P.2d at 439 (Orme, J., concurring) (quoting 18 Charles A. Wright et al., Federal Practice and Procedure § 4478, at 789–90 (1981)). In the context of this case, it is important to emphasize that, properly understood, the law of the case doctrine did not restrict the scope of Judge Jones's discretion any more than Judge Taylor's was restricted by the court's prior order approving and implementing the parties' stipulation. With one exception not relevant here, *see* Utah Code Ann. § 78-7-19(1) (2002), initial and subsequent judges of the same court are on the same footing as concerns the effect of a prior order on later judicial action. *See Trembly v. Mrs. Fields Cookies,* 884 P.2d 1306, 1311 n. 4 (Utah Ct.App.1994) (" '[I]n a sense, the two judges, while different persons, constitute a single judicial office for law of the case purposes.' ") (quoting *Gillmor,* 850 P.2d at 439–40 (Orme, J., concurring)).

¶ 23 Although we have explained that the doctrine is not an "inexorable command," we

---

9. Section 78–30–4.16(1) insures that all parties entitled to notice and consent have not been denied that right, and section 78–30–4.16(2) requires a court to conduct an evidentiary hearing when an adoption petition is denied. *See* Utah Code Ann. § 78–30–4.16(1), (2) (2002).

10. *See In re Adoption of B.T.D.,* 2003 UT App 99, ¶ 19, 68 P.3d 1021 ("A parent's consent to adoption is irrevocable in Utah, *see* Utah Code Ann. § 78–30–4.20 (2001), unless the parent can show that the consent 'was not entered into voluntarily but was induced through duress, undue influence, or under some misrepresentation or deception; or other grounds which would justify release from the obligations of any contract.' ") (citation omitted).

view it as a sound presumptive rule and its application should not be disregarded in the exercise of unfettered discretion. Because of the rule's sensible principles, "[t]he standards announced for departing from the law of the case commonly demand strong justification," 18B Charles A. Wright et al., Federal Practice and Procedure § 4478, at 670 (2002), and judges should not depart from the doctrine unless a compelling reason exists.

¶ 24 No such reason exists in this case. The Cs have not demonstrated that the stipulation and resulting order were so flawed that they demanded repudiation by Judge Jones, nor that Dr. Wehl's recommendation was so outlandish as to compel rejection. The Cs primary argument is that the stipulation was breached because the evaluation was flawed and the recommendation was not in the best interests of the child. We disagree.

¶ 25 The stipulation's guiding principle was that a neutral evaluation would go a long way in meeting the child's best interest. It is apparent that Dr. Wehl had only this goal in mind, as evidenced by the exhaustive evaluation he prepared and submitted.[11] In conducting the evaluation, he was instructed to primarily consider the conduct of all the parties in determining what would be in the child's best interest, as well as to consider the interests of the other minor children of both parties.[12] To comply with these guidelines, Dr. Wehl personally interviewed each member of both families and prepared a summary of his observations. He allowed each party to present their version of the events relevant to this case and allowed them to respond to and submit documents refuting any accusations made by the opposing party.

¶ 26 During his home visits, Dr. Wehl made observations about child autonomy, family interactions, and the physical environment. Time spent away from the parties was used for reviewing court documents, affidavits, DCFS records, school records, medical records, and depositions. He used a variety of psychological assessments of the parties to examine various dimensions of their personalities, including multiphasic personality inventories, a parent-child relationship inventory, and various intelligence achievement tests. When reviewing all the data compiled during the course of his evaluation, Dr. Wehl weighted the data differentially, depending upon the reliability of the data or source. Highest priority was given to information coming from independent third parties and other objective information, while lowest priority was given to inconsistent or clearly biased statements.

¶ 27 It is apparent that, when the parties entered into the stipulation, their intent was to rely upon the evaluation of a qualified clinical psychologist who could provide them with an unbiased recommendation. As shown in the record, Dr. Wehl's impartial methods provided this reliable avenue for determining the best interests of the child.

¶ 28 As evidence that the child would not fare as well if raised by the Cs, Dr. Wehl identified specific conditions in the Cs' home that could be inimical to the child's best interest. For example, among many other things, he noted that the C children were delayed in their educational development and exhibited minimal social skills, which was supported by his observation that the "level of social isolation experienced by the [C] family is quite severe"; one child had "no friends and no social outlets"; and the Cs' solution to family problems was "to isolate" the children.

¶ 29 Confirming T.H.'s concern, he noted that the average range for successful toilet training in a Down syndrome child is from two to seven years old. However, the Cs' ten-year-old child with Down syndrome still

11. As one justification for voiding the stipulation between the parties, Judge Jones stated that Dr. Wehl used the wrong guidelines to conduct the evaluation because he used the guidelines for a custody evaluation in a divorce proceeding rather than the guidelines for an adoption proceeding. However, Dr. Elizabeth Stewart, a clinical psychologist with forty-four years experience in conducting adoption evaluations, reviewed Dr. Wehl's evaluation and averred that it complied with the proper standards used in both custody and adoption cases.

12. At the time Dr. Wehl completed his evaluation, T.H. had two minor children and the Cs had four minor children and one eighteen-year-old son who no longer lived at home.

wore diapers and received no active toilet training from any family members. With apparent concern, he identified the two children with cerebral palsy and Down syndrome as receiving differential treatment and experiencing possible neglect.[13] The evaluation set forth the following reasoning for Dr. Wehl's final recommendation:

> It is evident that the decisions of [the Cs] have seriously hampered the development of the [C] children socially and educationally. All of the children are many years delayed in their educational development. The social needs of the children have not been met to any significant extent. [T.H.'s c]hildren, by contrast, are functioning quite well, socially and educationally. What difficulties they have [T.H.] is aware of, and working with appropriate people (e.g., schools, tutors) to remedy.[14]

¶ 30 The Cs argue that Dr. Wehl's recommendation was not in the best interests of the child. However, given Dr. Wehl's findings, we cannot say the evidence weighs against his ultimate recommendation—much less to the degree required to overcome the presumptive effect of the law of the case. Dr. Elizabeth Stewart, an attorney and clinical psychologist with recognized expertise in the area of child custody, reviewed Dr. Wehl's detailed custody evaluation and attested to its competency:

> [T]he process complied with professional standards and ... the evidence relied upon comported with professional standards and with legal standards in custody and adoption cases. Given the facts reported, the ultimate recommendation to disallow the adoption and return custody to [T.H.] appears to be appropriate and in the best interests of the child. I find no reason to

question that ultimate recommendation on either psychological or legal grounds.[15]

¶ 31 Because the Cs have not demonstrated that Dr. Wehl's evaluation was biased, not in the best interests of the child, or otherwise flawed, we hold that Judge Jones abused his discretion in not enforcing the parties' stipulation, in departing from the prior order entered by Judge Taylor, and in rejecting Dr. Wehl's recommendation in the absence of demonstrated irregularities in his methods or conclusions.

## CONCLUSION

¶ 32 We hold that the stipulation was intended to be a binding settlement agreement, to provide a process for a full, fair, and complete resolution of the contested adoption. Because there appears to be no reason for noncompliance with the settlement agreement other than the Cs' disagreement with the outcome of the evaluation, we see no basis on which the parties' stipulation and the resulting order of Judge Taylor can properly be renounced, especially given the presumptive effect of the law of the case doctrine. Because we do not detect any fatal flaws in the creation or implementation of the settlement agreement, it should have been enforced by Judge Jones. Judge Jones abused his discretion in departing from Judge Taylor's order and should have enforced the stipulation for evaluation and final resolution. Accordingly, we vacate Judge Jones's order and remand for such other proceedings as may now be appropriate.

¶ 33 I CONCUR: WILLIAM A. THORNE JR., Judge.

---

13. Dr. Wehl reported that the child with cerebral palsy was, on several occasions, left alone curbside to wait twenty-five to thirty-five minutes for the bus in near freezing temperatures. He also noted that the room shared by the children with disabilities emitted a strong odor of feces and urine.

14. In a final attempt to discredit the validity of the stipulation, the Cs assert that the enforcement of the stipulation violates public policy because in his evaluation, Dr. Wehl indicated race

as "[a]nother element of importance in this case." However, after viewing the evaluation in its entirety, it is clear that Dr. Wehl did not base his recommendation upon race, but upon his conclusions about the Cs' inability to properly socialize their children.

15. The affidavits of school principal Art Stowers, Professor John McDonnell, and Phillip Johnson also indicate that Dr. Wehl's recommendation was in the best interests of the child at that time.

¶ 34 I CONCUR IN THE RESULT:
RUSSELL W. BENCH, Associate Presiding
Judge.